1   DAVID L. ANDERSON (CABN 149604)
    United States Attorney
2
    HALLIE HOFFMAN (CABN 210020)
3   Chief, Criminal Division

4   ANDREW M. SCOBLE (CABN 124940)
    RAVI T. NARAYAN (IABN AT0011948)
5   Assistant United States Attorneys

6        450 Golden Gate Avenue, Box 36055
         San Francisco, California 94102-3495
7        Telephone: (415) 436-7249/7369
         FAX: (415) 436-7234
8        Andrew.Scoble@usdoj.gov
         Ravi.Narayan@usdoj.gov
9
    Attorneys for United States of America
10
                   UNITED STATES DISTRICT COURT
11
                NORTHERN DISTRICT OF CALIFORNIA
12
                     SAN FRANCISCO DIVISION
13

14   UNITED STATES OF AMERICA,          )   CASE NO. CR 18-0119 RS
                                        )
15              Plaintiff,              )   GOVERNMENT'S OPPOSITION TO
                                        )   DEFENDANT'S MOTION FOR RELEASE FROM
16        v.                            )   CUSTODY
                                        )
17   EDDY URBINA,                       )
                                        )
18              Defendant.              )
     _____)
19

20                        **TABLE OF CONTENTS**

21   INTRODUCTION ..................................................................................................................2

22   BACKGROUND ....................................................................................................................3

23   I.      OFFENSE CONDUCT ................................................................................................3

24   II.     ADDITIONAL RELEVANT FACTUAL BACKGROUND ........................................5

25           A.      Criminal History and Gang Involvement.........................................................5

26           B.      Evidence of Gang Involvement .......................................................................6

27           C.      Prior Performance on Supervision ...................................................................9

28           D.      Risk of Retaliation Against Witnesses............................................................10

GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION FOR RELEASE FROM
CUSTODY

E.     Risk Factors for Flight .........................................................................10

ARGUMENT .........................................................................................................................10

I.     LEGAL STANDARDS ...............................................................................................10

II.    DEFENDANT IS A DANGER TO THE COMMUNITY AND A FLIGHT RISK ...................11

     A.     Defendant Is a Danger to the Community .......................................................12

     B.     Defendant Is a Flight Risk .............................................................................13

**III.   DEFENDANT HAS NOT SHOWN THAT HE IS ENTITLED TO RELEASE** .........................14

CONCLUSION ......................................................................................................................17

## INTRODUCTION

The government opposes Defendant Eddy Urbina's motion for temporary release, and requests that the Court order him to remain in custody pending trial. Defendant, who waived detention findings in April 2018, is charged as a triggerman in a gang-related double murder. In addition to the two counts of Murder in Aid of Racketeering, which each carry a mandatory term of life imprisonment, Defendant faces a number of charges relating to his membership and participation in the 19th and 16th Street Sureños, a criminal racketeering enterprise. Due to his offense conduct, gang involvement, criminal history, and the punishment he would receive if convicted of murder, defendant poses both a danger to the community and a risk of flight. Indeed, there is a rebuttable presumption that defendant is both a danger and flight risk, and neither are sufficiently mitigated by his proposed release plan.

Defendant's recent positive test for COVID-19 does not warrant a change in his custody status. He is being quarantined, monitored, and treated in accordance with protocol at Santa Rita Jail. Defendant's proposed release plan – which involves living at his mother's house, where other family members also live – fails to sufficiently mitigate public health risks. Further, Defendant has not established a "compelling" reason for temporary release, as required by statute. He has not shown that his physical well-being would be improved by release to a family home, where he would no longer be under the supervision of health care professionals. Indeed, Defendant has not established that temporary release would result in a higher likelihood of recovery, let alone that release is necessary for recovery. His motion should be denied.

GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION FOR RELEASE FROM CUSTODY

**BACKGROUND**

In this section, the government proffers relevant evidence in support of its allegation that Defendant is a triggerman in a double murder, as charged in the Indictment.  The government goes on to proffer additional information about Defendant that is pertinent to the issues of danger and flight risk, including his criminal history, gang involvement, and prior performance on supervision.

## I.    OFFENSE CONDUCT

The government proffers that Defendant was a triggerman in a gang-related double murder committed on September 4, 2008, in retaliation for the murder several hours earlier of a 19th Street Sureños gang member.

A little before 10:00 p.m. on September 4, 2008, in known Norteño territory, Defendant Urbina and codefendant Luis Rojas approached two young men where they stood in front of a building.  From close range, Urbina and Rojas fired multiple rounds from two handguns.  One victim, shot in the head, was pronounced dead at the scene.  The second suffered a gunshot wound to the neck that damaged his spine; he was pronounced dead at the hospital.  A female friend standing by the two male victims suffered five gunshot wounds to the left arm and breast but survived.  Bullets recovered at the crime scene and in the course of the autopsies indicated that the assailants used a .22-caliber and a .357-caliber revolver in the attack.

According to witness statements, the shooters both fired handguns, and both wore black or dark gray hoodies and wore white, hockey-style masks.  After the shooting, they fled on foot to a waiting minivan parked around the corner.  The getaway vehicle belonged to codefendant Josue Gonzales, who now sped away from the murder scene.  The perpetrators later took steps to cover their tracks, including disposing of clothing and, it appears, of the two murder weapons.

Investigation revealed that these murders were committed in retaliation for the fatal shooting of 19th Street Sureños gang member Giovanni Lechado ("Sharky") approximately four hours earlier.  Lechado had been fatally shot as he sat in a car in an area frequented by members of the 19th and 16th Street Sureños.  With him in the car was his girlfriend.  In the rear was their baby, strapped into a car seat.  A male approached the car and fired through the windshield, hitting Lechado in the head and wounding his girlfriend in the torso.  The baby was unhurt.  Fellow gang members drove the victims to

San Francisco General Hospital.  Lechado was declared brain dead and taken off life support the following day.  The girlfriend survived, although hospital personnel recovered heroin and marijuana from her person.

Eight days later, on September 12, 2008, police officers and Defendant's probation officer executed a probation search of his room at his residence in San Francisco.  They found and seized a loaded .357-caliber Smith and Wesson revolver (subsequently determined not to be one of the double murder weapons), ammunition in various calibers (including a total of thirty-six .357-caliber rounds, one .22-caliber round, and ten .38 Special caliber rounds), as well as gang indicia and a digital scale.  Defendant was arrested.  He was subsequently convicted of being a felon in possession of a firearm.

In the week following his September 12, 2008 arrest, Defendant made a number of jail calls, which were recorded.  In these calls (which have been produced in discovery in this case), he appeared to express concern that there might be evidence linking him to the double murder, until he learned that ballistic tests require a comparison of casings to the actual firearms used, and also learned from a gang associate that a firearm that Defendant feared could be linked to him – presumably the .357-cal. revolver seized in the probation search – had not been used in any homicide.

In other calls, Defendant appeared to coach his girlfriend and his mother about the alibi evidence he wished them to provide; discussed various pieces of incriminating evidence (including items of clothing) that he and his family had destroyed or removed; expressed satisfaction that witness descriptions of the murder could not be linked to him ("they seen a tall motherfucker with mask on . . . . They never said about a short fat nigger walking around with him."); and, the government alleges, arranged for one of the two murder weapons (the "toolie") to be placed out of reach by police seeking to search Campos's residence.

Defendant also made a call to the cell phone of a fellow gang member who was apparently at the hospital with Lechado's wounded girlfriend.  Defendant told her that he was in jail, and that "what happened was for y'all."

Perhaps most significant are a series of calls in the evening on September 12, 2008.  When Defendant's girlfriend (now the mother of his children, living with his mother) reported that police had sought unsuccessfully to obtain consent to search her bedroom, and that she feared that officers would

return with a search warrant, Defendant immediately had her conference in, via "three-way" call, his fellow gang member "Monster" (Kevin Funes). Funes agreed to go immediately to Adriana Campos's residence and help her. In a subsequent call, Defendant was unable to reach his girlfriend at her number. When he finally spoke to her again, he was crying. He told her: "I thought you guys got caught?"

Then, in a call on September 18, 2008, Funes assured Defendant, who was speculating about the charges he might face, "That shit was handled . . . ." Defendant mentioned "187" (the California Penal Code charge for murder), and Funes responded: "It ain't no 187. The toolie got dropped off." (A "toolie," the government alleges, is slang for a firearm.) Funes added: "The toolie is long gone. Trust me. They made it Titanic . . . ."

## II.    ADDITIONAL RELEVANT FACTUAL BACKGROUND

### A.    Criminal History and Gang Involvement

The cursory criminal history report prepared by Pretrial Services does not present the full picture of Defendant Urbina's criminal history. (A more complete criminal history profile is contained in the March 9, 2016 Presentence Report in CR 15-0430 CRB, at Paragraphs 23-37.) It is true that he has suffered three adult felony convictions (Grand Theft for an assault and robbery of a cell phone in December 2007; felon in possession of a firearm in September 2008; and felon in possession of a firearm in 2015) and one juvenile adjudication for a felony accessory charge. *See also* PSR ¶¶ 23, 24, 25. But he has numerous other arrests which are wholly unaccounted for in the Pretrial Services report. These include multiple probation and parole violations. These are discussed in this section as well as Sections B and C below.

The government proffers that Defendant Eddy Urbina  ("Rhino" or "Ryn") has been a member of the 19th Street Sureños gang since at least 2003, based on an admission he made to police officers in 2007. He sold drugs in gang territory, committed strong-arm robberies with fellow gang members in gang territory, was shot in 2006, was known to have possessed firearms. His role in the 2008 gang-related double murder, and attempts at cover-up afterwards, are set forth above. The charges resulting from his probation search resulted in a state prison sentence followed by parole.

Following his release from prison, Defendant was encountered in gang territory on various occasions in 2011 and 2012. In September 2012, Defendant and others were returning from the funeral

1    of a fellow gang member in a car driven by codefendant Venegas; the traffic stop resulted in the seizure

2    of a loaded .454-caliber handgun from another gang member in the car.

3         In January 2015, following the indictment of various gang members in *United States v. Eduardo*

4    *Alvarez, et al.*, CR 14-120 EMC, deputies seized a letter which Defendant is believed to have written to

5    gang member Michael Viera ("Rocks"), containing coded identification of three suspected cooperators

6    in the government's case.

7         In June 2015, Defendant was arrested along with fellow gang member Michael Rojas ("Lil

8    Peewee") and found in possession of a loaded .380-caliber pistol, resulting in his guilty plea to a Section

9    922(g)(1) charge.  On March 28, 2016, Judge Breyer sentenced him to twelve months' imprisonment,

10   followed by three years' supervised release.  (CR 15-0430 CRB, Dkt. 25).  Defendant's supervised

11   release terms included Special Condition No. 5 that he "not associate with any member of the Sureño

12   gang."

13   **B.    Evidence of Gang Involvement**

14        Defendant has the following gang-related tattoos: "RIP Sharky" on his left forearm; "19" on his

15   right triceps and "ST" on his left triceps; one dot on the right wrist and three dots on the left wrist;

16   "CONS" and "XIX" on his abdomen; and a street sign with "Mission" and "19th" depicted within a San

17   Francisco Giants logo, on his left forearm.

18        As early as May 2003, while a juvenile, Defendant was arrested with a number of fellow gang

19   members for blocking pedestrian foot traffic and yelling obscenities at Carnival in the Mission District.

20   In July 2003, he and fellow 19th Street Sureños gang member Michael Viera ("Rocks") were detained in

21   the course of an altercation with a known gang rival in rival territory.  On multiple occasions in 2005

22   and 2006, Defendant was encountered in gang territory in the company of fellow gang members.

23   During one such encounter in September 2006, officers noted that his cell phone had the letters

24   "CRAZY 19ST" showing on it.  On October 28, 2006, EMTs found Defendant sitting on a street corner

25   near gang territory, with gunshot wounds to his lower left leg; he would say only that he had been shot.

26        On numerous occasions in 2007, Defendant was encountered by police in gang territory

27   accompanied by known gang members.  On July 20, 2007, he was walking with, or at least near,

28   codefendant Jonathan Aguilar when Aguilar was shot in the chest in gang territory.  An eyewitness

GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION FOR RELEASE FROM
CUSTODY

reported seeing four Hispanic males in a white sedan at the shooting scene. Defendant was interviewed, and admitted that he had been a "19th Street member" for the last four years, with the moniker "Rhino." Aguilar, too, admitted his gang membership. Aguilar and Defendant both claimed to have no knowledge of the shooter or shooters.

On December 21, 2007, Defendant was arrested with two other gang members for committing a strong-arm robbery and then a battery, in two separate incidents within gang territory. First, at 16th and Hoff Streets, a victim was accosted by Defendant and fellow gang member Denis Peralta ("Whisper"). One of the gang members walked into the victim and spilled his drink, whereupon both started punching the victim and one of them seized his Blackberry. The assailants fled. The victim flagged down an officer at 16th and Mission Streets, and made a report. Within minutes, both assailants were in police custody, one arrested in a car after the victim spotted him and called police, and the other arrested following another altercation.

The second altercation followed close on the heels of the first. After the first victim was beaten and robbed, a second victim was walking on 16th Street when he encountered Defendant and two males. Defendant started a fight and struck the second victim in the face. The second victim fought back and subdued Defendant. At this point a fellow gang member intervened, and threatened the second victim. Police arrived, and the two gang members fled. However, the second victim saw Defendant discard the Blackberry that had just been stolen from the first victim. Defendant ultimately entered a guilty plea to Penal Code Section 487(c) (theft from person), and received probation; this was followed by a 2009 revocation which resulted in a prison sentence of sixteen months. (As the Defendant notes in his motion, in 2017 this felony conviction was reduced to misdemeanor status.)

In May 2008, Defendant was arrested in gang territory for violating a stay-away order. He was with current codefendants Venegas and Aguilar.

The incidents of September 8 and September 12, 2008 are described above.

In November 2009, police encountered Defendant in gang territory with fellow gang members Jusef Nathan ("Boo") and Michael Viera ("Rocks") – both of whom subsequently entered guilty pleas to racketeering-related charges in CR 14-120 EMC. Officers executed a parole search on Nathan's car and found a quantity of heroin packaged for sale. Defendant's parole was violated in May 2010, and he

returned to San Quentin.

At various times in 2009, 2010, and 2011, police encountered Defendant in the company of other gang members.[1]  Similarly, in 2012, Defendant was encountered in gang territory with one or more other gang members.  This included the September 10, 2012 traffic stop of a car driven by codefendant Venegas following a funeral service for a deceased gang member.  Also in Venegas's car were Defendant, Eduardo Alvarez (also convicted in CR 14-120 EMC), and gang associate Magdalena Lopez (Shorty), along with Lopez's five-year-old daughter.  Officers found and seized a backpack with a loaded .454-caliber handgun.  Alvarez admitted possession of the gun, and was convicted in state court of being a felon in possession of a firearm and participating in a criminal street gang.

On November 27, 2013, law enforcement officers seized from co-defendant Venegas's residence a 19th Street Sureños "roster" which included, among several dozen names of identifiable gang members, "Ryn" (for Rhino).

In late January 2015, deputy sheriffs at the jail where most of the defendants in CR 14-120 EMC were being housed intercepted a letter addressed to gang member Michael Viera ("Rocks").  The government proffers that this letter was authored by Defendant.  The government proffers that this letter to gang member Viera contained coded references to three gang members suspected of cooperating with law enforcement.  The significance of this communication, in the government's view, is that one of the gang's rules is a strict prohibition against cooperating with law enforcement, and that violation of the gang's rules can be punished by various forms of violence, up to and including a "green light" (sanctioned murder of the gang member by his own gang).

On June 12, 2015, police officers contacted Defendant, who was a passenger in a car driven by Michael Rojas (gang member "Lil Peewee").  Officers saw Defendant remove an object from his waistband, and discovered it to be a loaded .380-caliber Ruger pistol.  Defendant Urbina was charged

---

[1]  Among these incidents was Defendant's arrest on or about July 20, 2010.  As reported in SFPD Incident No. 100-664-491, SFPD officers surveilling the residence of gang member Hugo Quintero (aka Hitman), observed Defendant Urbina walk up and enter.  Urbina was on parole, with a no-gang-association condition.  When officers executed a parole search of the Defendant, they found and seized a Visine bottle of suspected heroin in his front pants pocket.  Urbina was arrested and, it appears, his parole was violated.

1   with a violation of 18 U.S.C. § 922(g).  He ultimately entered a guilty plea and was sentenced to 12

2   months' prison.

3          On March 7, 2018, Defendant was encountered during the traffic stop of a car in gang territory.

4   The driver was a female.  Defendant was a passenger in the rear seat.  The front passenger, and

5   registered owner of the car, was fellow Sureño gang member Jose Aguilar ("Slim").  In the trunk of the

6   car was a handgun lawfully registered to Aguilar.  As noted above, Defendant was on federal supervised

7   release at the time of this incident, and his terms included in Special Condition No. 5 that he "not

8   associate with any member of the Sureño gang."  (CR 15-0430 CRB, Dkt. 25).

9          On or about April 5, 2018, Defendant was arrested in connection with this case.  He has

10  remained in custody since then.

11      **C.      Prior Performance on Supervision**

12         Defendant's criminal history underscores the lack of amenability to supervision.  The following

13  incidents are drawn from the Presentence Report prepared in connection with Defendant's 2015 Section

14  922(g) case, *United States v. Urbina*, CR 15-0430 CRB.

15         Following his March 7, 2008 arrest and convictions in connection with a strong-arm robbery

16  committed with fellow gang members, he received a sentence of limited custody and three years'

17  probation.  PSR ¶ 24.  That probation was revoked following the September 12, 2008 probation search

18  which yielded a firearm, ammunition, and drug paraphernalia.  His probation was revoked and he was

19  sentenced to 16 months in prison.  *Id*. ¶ 25.

20          He was also arrested on or about May 5, 2008 for contempt of court, when SFPD officers

21  encountered him with other gang members in the area of 16th and Mission Streets, in violation of a stay-

22  away order.  PSR ¶ 32.

23         Following his initial parole from state prison in June 2009, Defendant was encountered by SFPD

24  officers on or about December 26, 2009, riding in a car with another gang member.  In the car officers

25  found replica firearms, with the orange parts painted black.  PSR ¶¶ 25, 33.  It appears that his parole

26  was violated in January 2010, and he was again released on parole in August 2011.  *See* PSR ¶ 25.

27         On or about February 22, 2012, Defendant was arrested while loitering at 16th and Mission

28  Streets with other gang members, in violation of his parole.  His parole was again violated.  PSR ¶ 34.

GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION FOR RELEASE FROM
CUSTODY

1   On March 7, 2018, as noted above, Defendant associated with fellow Sureño gang member Jose
2   Aguilar, in violation of his federal supervise release terms.

3       **D.      Risk of Retaliation Against Witnesses**

4       The government proffers that the criminal street gang of which Defendant is a member includes
5   among its rules a prohibition of cooperating with law enforcement, particularly cooperating in the
6   investigation or prosecution of fellow 19th Street and 16th Street Sureños gang members.  This is the
7   significance of the January 2015 letter to incarcerated gang member Michael Viera in CR 14-120 EMC.
8   It constitutes, the government alleges, an effort to identify (whether correctly or incorrectly) fellow gang
9   members believed to be cooperating in the charged federal case.

10      **E.      Risk Factors for Flight**

11      Defendant faces, if convicted on the VICAR murder charges, a sentence of mandatory life.
12  While it is true that the government is not seeking the death penalty against Defendant Urbina, the fact
13  remains that he faces a significant, and mandatory, sentence if convicted.  This exposure, the
14  government submits, provides a significant incentive to flee.

15                                  **ARGUMENT**

16  **I.      LEGAL STANDARDS**

17      The Bail Reform Act of 1984 permits pretrial detention of a defendant without bail where "no
18  condition or combination of conditions will reasonably assure the appearance of the person as required
19  and the safety of any other person and the community."  18 U.S.C. § 3142(e)(1).  Detention is
20  appropriate where a defendant is either a danger to the community or a flight risk.  *United States v.*
21  *Motamedi*, 767 F.2d 1403, 1406 (9th Cir. 1985).  A finding that a defendant is a danger to the
22  community must be supported by clear and convincing evidence.  18 U.S.C. § 3142(f)(2)(B).  A finding
23  that a defendant is a flight risk need only be supported by a preponderance of the evidence.  *Motamedi*,
24  767 F.2d at 1406.  Where, as here, there is probable cause to believe that the defendant committed an
25  offense that is a crime of violence (Counts Nine, Ten, Eleven) or has a maximum punishment of life
26  imprisonment or death (Counts One, Nine, Ten, Eleven), there exists a rebuttable presumption that "no
27  condition or combination of conditions of release will reasonably assure the appearance of the person as
28  required and the safety of the community."  18 U.S.C. § 3142(e).

GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION FOR RELEASE FROM
CUSTODY

1    The Court must consider four factors in determining whether the pretrial detention standard is

2    met:  (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the

3    defendant; (3) the history and characteristics of the defendant, including the defendant's character,

4    physical and mental condition, family and community ties, past conduct, history relating to drug or

5    alcohol abuse, criminal history, and record concerning appearance at court proceedings, as well as

6    whether the crime was committed while the defendant was on probation or parole; and (4) the nature and

7    seriousness of the danger to any person or to the community that would be posed by the defendant's

8    release.  18 U.S.C. § 3142(g); *United States v. Winsor*, 785 F.2d 755, 757 (9th Cir. 1986).  "[T]he Bail

9    Reform Act mandates an [1] individualized evaluation [2] guided by the factors articulated in

10   § 3142(g)."  *Diaz-Hernandez*, 943 F.3d at 1199.

11   Pursuant to 18 U.S.C. § 3142(f), a detention hearing may be reopened "if the judicial officer

12   finds that information exists that was not known to the movant at the time of the hearing and that has a

13   material bearing on the issue whether there are conditions of release that will reasonably assure the

14   appearance of such person as required and the safety of any other person and the community."

15   18 U.S.C. § 3142(f).

16   Under 18 U.S.C. § 3142(i), a judicial order may "permit the temporary release" of a defendant

17   "to the extent that the judicial officer determines such release to be necessary for preparation of the

18   person's defense or for another compelling reason."  The government bears the ultimate burden of

19   persuasion to detain pretrial.  *Hir*, 517 F.3d at 1087.  However, once a defendant is ordered detained, it

20   is the defendant who must show that temporary release is necessary under Section 3142(i).  *United*

21   *States v. Dupree*, 833 F. Supp. 2d 241, 246 (E.D.N.Y. 2011).

## II.   DEFENDANT IS A DANGER TO THE COMMUNITY AND A FLIGHT RISK

23   This Court should order Defendant detained as both a danger to the community and a flight risk.

24   First, Defendant's involvement in a double murder, his gang involvement, and his criminal history

25   shows that he poses a danger to the community.  Second, Defendant poses a risk of flight due to the

26   mandatory terms of life imprisonment he faces upon conviction.  Neither Defendant's danger to the

27   community nor his flight risk is mitigated by the current pandemic, nor are they sufficiently mitigated by

28   his proposed release plan.  And as noted above in Section I, because Defendant is charged with crimes

GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION FOR RELEASE FROM
CUSTODY

of violence and offenses for which there is a maximum punishment of life, there is a presumption in favor of detention under § 3142(e).

### A.    Defendant Is a Danger to the Community

Defendant's alleged involvement in a double murder, especially when considered with his criminal history, historical gang involvement, and history of noncompliance on supervision, shows that he is a danger to the community.  He has engaged in a steady pattern of repeated gang activity, including specific instances of violent criminal activity, throughout his adult life.  This pattern is laid out in detail above.  Of most significance, of course, is the double murder that the government alleges he perpetrated in 2008.  While this murder remained unsolved for almost ten years, defendant engaged in regular gang activity until his arrest on a federal gun case in 2015.  Following his release on that case, and shortly before his arrest on the instant matter, Defendant was encountered in gang territory, with a gang member.

In some ways, COVID-19 exacerbates the danger that Defendant poses on release.  Releasing dangerous defendants prematurely can have dire consequences.  *See* https://www.cnn.com/2020/04/14/us/man-released-jail-coronavirus-arrested-trnd/index.html (noting that a defendant in Florida was released and then arrested two days later for second degree murder).  Defendant poses a danger to others due to his gang membership, his affinity for firearms, and his willingness to perpetrate violent acts.

Not only does Defendant present a danger to other people, but the community itself is more vulnerable to such danger given the COVID-19 pandemic.  For example, people are at higher risk of violent robberies because they are home rather than out of home; people are likely more susceptible to fraud because there is heightened fear and uncertainty.  There is less foot traffic in the streets, making those who do have to leave home more vulnerable, as criminals can prey upon them with less concern than normal that a bystander will observe or intervene.  Moreover, because first responders are focused on mitigating the effects of the COVID-19 outbreak, they are less equipped to prevent and respond to wrongdoing.  Indeed, as a district court in Maryland observed, installation of location monitoring tools poses a risk to United States Pretrial Services officers "given the current recommendations regarding implementation of social distancing."  *United States v. Martin*, 2020 WL 1274857, Case No. PWG-19-

140-13 (D. Md. Mar. 17, 2020).

In the current climate, irresponsible social habits can also endanger the health of the community. *Hir*, 517 F.3d at 1088 (holding that "community," within the meaning of 18 U.S.C. § 3142, is not necessarily confined to local geography). The entire state of California is currently ordered to shelter in place and "heed the current State public health directives," indefinitely, to avoid the spread of COVID-19. California Executive Order N-33-20, available at https://covid19.ca.gov/img/Executive-Order-N-33-20.pdf (issued March 19, 2020). Such rules, though enforced by peace officers, rely largely on voluntary obedience. A person who ignores such admonitions and rules could increase infection rates, leading to severe illness and death. Defendant has shown an unwillingness or inability to follow rules and a disregard for the welfare of others. This is true not only because of his willingness to commit violent crimes, but because of his prior noncompliance while under court supervision, including violating a federal court order as recently as March 2018. *See* Section II(C) above.

### B.    Defendant Is a Flight Risk

There are no conditions or combination of conditions that reasonably mitigate Defendant's risk of flight. Section 3142(e) is primarily concerned with reasonably assuring the appearance of the defendant so that the judicial proceedings may proceed. Nothing about the COVID-19 pandemic changes Defendant's incentives to flee. He remains subject to significant penalties upon conviction. Although Defendant cites the government's decision to not seek the death penalty as a "changed circumstance" in support of his release motion, he still faces *mandatory* life imprisonment if convicted of Murder in Aid of Racketeering, as charged in Counts Nine and Ten. *See* 18 U.S.C. § 1959(a)(1). Though Defendant proposes temporary release, the potential punishment furnishes a strong incentive to flee before this temporary period is complete. If Defendant returns to custody and is convicted of Count Nine, Count Ten, or both, he will never be released from custody again.

It is true that international travel may make certain types of flight more difficult. But flight risk is not limited to a defendant leaving the country. During a time when community resources are devoted to fighting COVID-19, it may be easier for a motivated defendant to hide. Just as a defendant's access to resources increases his risk of flight, so too does law enforcement's lack of access to resources to safeguard against the defendant's flight. *See* 18 U.S.C. § 3142(g)(3)(A) (requiring consideration of the

GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION FOR RELEASE FROM CUSTODY

1   defendant's "financial resources"); *United States v. Townsend*, 897 F.2d 989, 996 (9th Cir. 1990)

2   (considering defendants' "access to substantial sums of cash").

3       This Court should order that Defendant remain in custody, just as numerous magistrate judges

4   have denied similar motions for pretrial release, including those brought by defendants with underlying

5   medical conditions.  *See, e.g.*, *United States v. Reynolds*, 18-CR-158 JD (SK), Dkt. 108 (N.D. Cal.)

6   (ordering defendant identified as medically vulnerable to COVID-19 by Santa Rita Jail detained pretrial

7   on the basis of danger); *United States v. Batiste*, 16-CR-278 CRB (JCS), Dkt. 63 (N.D. Cal) (denying

8   motion for release based on COVID-19 of defendant with heart and lung damage on the basis of danger,

9   insufficient information regarding medical condition and inadequate release plan); *United States v.

10  Sanchez*, No 19-CR-576 VC (JSC), Dkt. 23 (N.D. Cal.) (denying motion for release of defendant on the

11  basis of danger and rejecting proposal that he live with mother because he had previously been living

12  with them while committing his offenses); *United States v. Traore*, No. 20-CR-029-VC (JSC), Dkt. 28

13  (N.D. Cal.); *United States v. Campos*, No. 19-CR-0280-RS (JSC), Dkt. 95 (N.D. Cal.); *but see In the

14  Matter of the Extradition of Alejandro Toledo Manrique*, No. 19-mj-71055-MAG-1 (TSH), Dkt. 115

15  (N.D. Cal.) (granting motion for release premised on COVID-19 concern in extradition proceeding, with

16  different standards for release than under the Bail Reform Act, where defendant was more than 70 years

17  old); *United States v. Garcha*, No. 19-cr-00663-EJD-1 (VKD), Dkt. 26 (Apr. 1, 2020) (denying relief

18  under § 3142(f) but granting temporary release under 18 U.S.C. § 3142(i) where the defendant's

19  "individual circumstances—a compromised immune system [due to HIV] and lung damage due to a

20  pulmonary embolism—render him particularly susceptible to infection from the COVID-19 virus while

21  in custody and particularly at risk of severe illness or death as a result of such infection").

22  **III.    DEFENDANT HAS NOT SHOWN THAT HE IS ENTITLED TO RELEASE UNDER 18
          U.S.C. § 3142(i)**

23

24      Defendant is likewise ineligible for release under 18 U.S.C. § 3142(i).  Under 18 U.S.C. §

25  3142(i), a judicial order may "permit the temporary release" of a defendant "to the extent that the

26  judicial officer determines such release to be necessary for preparation of the person's defense or for

27  another compelling reason."  Once a defendant is ordered detained, it is his burden to show that

28  temporary release is necessary under Section 3142(i).  *United States v. Dupree*, 833 F. Supp. 2d 241,

GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION FOR RELEASE FROM
CUSTODY

1    246 (E.D.N.Y. 2011).  In Defendant's motion, he does not allege that release is necessary for preparation

2    of his defense.  Therefore, he must show that there is "another compelling reason" for release.

3            COVID-19 is not a compelling reason for release.  Unquestionably, the COVID-19 pandemic is a

4    public health emergency.  But Defendant has not demonstrated that his positive COVID-19 test warrants

5    temporary release.  For example, Defendant has not shown that (1) he is at high risk to become severely

6    ill from COVID-19, (2) his facility is unequipped to provide appropriate medical care, or (3) that he

7    faces guaranteed superior care outside custody, given the parameters of his suggested release conditions.

8    Defendant has not therefore shown that temporary release is necessary for the compelling reason of

9    protecting his life.

10           Courts have generally recognized that "it is a rare case in which health conditions present an

11   'exceptional reason'" to allow for release where detention would otherwise be warranted.  *See, e.g.*,

12   *United States v. Wages*, 271 F. App'x 726, 728 (10th Cir. 2008) (collecting cases).  And Defendant does

13   not establish an evidentiary basis to conclude that he is at higher risk of getting very sick or dying from

14   COVID-19 based on one of the CDC's defined health conditions triggering substantially increased risk.

15   *See* http: https://www.cdc.gov/coronavirus/2019-ncov/specific-groups/high-risk-complications.html.

16   Although the CDC's risk categories include "[p]eople with severe obesity (body mass index [BMI] of 40

17   or higher)" and "[p]eople with diabetes," defendant only argues that he is "significantly overweight" and

18   "pre-diabetic."  But even if Defendant were able to establish, through medical records or otherwise, that

19   he falls within a CDC-defined risk category, this would only enhance the need for medical supervision.

20   Defendant is receiving regular medical supervision at Santa Rita Jail.  He would not receive regular

21   medical supervision if released pursuant to his release plan.

22           Indeed, Defendant cannot establish that Santa Rita Jail is unable to administer constitutionally

23   acceptable treatment.  *Cf. United States v. Kidder*, 869 F.2d 1328, 1330–31 (9th Cir. 1989) (to prevail on

24   Eighth Amendment claim regarding avoiding prison due to medical condition, defendant "must show

25   that *no* constitutionally acceptable treatment can be provided while he is imprisoned" and collecting

26   cases).  Santa Rita has demonstrated its ability to care for inmates.  As of April 18, 2020, Santa Rita Jail

27   had reported 15 confirmed cases of inmates who had tested positive for COVID-19.

28   https://www.alamedacountysheriff.org/admin_covid19.php (last visited April 18, 2020).  Moreover, 15

GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION FOR RELEASE FROM
CUSTODY

1   inmates previously testing positive for COVID-19 have fully recovered under institutional care,

2   according to the jail.  Here, Defendant proposes being released to his mother's house, where he would

3   be living with family members.  While Santa Rita can assure that Defendant will be medically treated

4   and quarantined, there is no such assurance if Defendant is released.  Moreover, Defendant has not

5   indicated that the specific post-release conditions he has proposed would secure his overall well-being

6   better than remaining in custody.

7          In addition to defendant's well-being, the Court should be mindful of the health risk that

8   Defendant, as someone who is positive for COVID-19, would pose to others if released.  Santa Rita Jail

9   is following CDC Guidance for correctional institutions, and enacting social distancing measures to the

10  extent possible.[2]  Santa Rita Jail has enacted extensive measures to prevent the spread of COVID-19,

11  including specific quarantine and isolation protocols.  Santa Rita staff has informed the government that

12  they have already shared with the Court the jail's specific precautionary measures taken in response to

13  COVID-19.  Indeed, Defendant is currently quarantined at the jail, and jail staff are available to provide

14  necessary medical care and enforce the quarantine.  Defendant's proposal, on the other hand – that he be

15  released to live in a family home – raises a risk of infection to others, including the family members with

16  whom he would be living, and potentially, members of the community with whom they interact.

17  //

18  //

19  //

20  //

21  //

22  //

23  //

24  //

25  //

26

27

28  _____

    [2] CDC Guidance for Correctional & Detention Facilities can be found here:
    https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html.

GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION FOR RELEASE FROM
CUSTODY

1

## CONCLUSION

2        For the reasons set forth above, the Court should find that Defendant would pose both a danger

3   to the community and a risk of flight if released.  Moreover, Defendant has not demonstrated that

4   COVID-19 is a compelling reason for release.  Accordingly, the Court should deny Defendant's motion

5   for release.

6   DATED:  April 19, 2020                                  Respectfully submitted,

7                                                           DAVID L. ANDERSON

8                                                           United States Attorney

9                                                           ___/s/_____

10                                                          ANDREW M. SCOBLE

                                                            RAVI T. NARAYAN

11                                                          Assistant United States Attorneys

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION FOR RELEASE FROM
CUSTODY